IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MODEST E. DONALDSON,** )<br><br>              **Plaintiff,** )<br><br>**vs.** )<br><br>**CAROLYN W. COLVIN,**<br>**Acting Commissioner of Social**<br>**Security,** )<br><br>              **Defendant.** ) | **Civil No. 13-cv-429-CJP**[1] |

### <u>MEMORANDUM and ORDER</u>

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Modest E. Donaldson seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

### <u>Procedural History</u>

Ms. Donaldson filed an application for benefits in July, 2006, alleging disability beginning on July 7, 2006.   (Tr. 92).   Following an evidentiary hearing, the application was denied in March, 2009.   (Tr. 38-51).   After the Appeals Council denied review, plaintiff sought judicial review.   See, *Modest Donaldson v. Michael Astrue*, Case No. 11-cv-554-JPG-CJP.   District Judge J. Phil Gilbert ordered the case remanded to the agency for further proceedings in July, 2012. (Tr. 1008-1034).

On remand, the case was assigned to ALJ Stuart T. Janney.   Additional

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 20.

medical records were submitted, and ALJ Janney held another evidentiary hearing.

He then denied the application on March 1, 2013.   (Tr. 875-906).

### Issues Raised by Plaintiff[2]

Plaintiff raises the following interrelated points:

1.   The ALJ erred failing to incorporate limitations based on plaintiff's need to elevate her legs and on pain and swelling in her hands into his RFC assessment.

2.   The ALJ failed to properly consider the opinions of Drs. Davis and Sawar and of physical therapist Wilson.

3.   The ALJ failed to account for plaintiff's moderate difficulties in maintaining concentration, persistence or pace.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   **42 U.S.C. §423(d)(1)(A).**

---

[2] Plaintiff listed a fourth issue in her statement of issues, i.e., that the ALJ failed to properly assess her credibility.   See, Doc. 21, p. 2.   However, she presented no argument on that point in the body of her brief, and the Court deems the issue to have been waived.   *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of

performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).   See also Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."   **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Ms. Donaldson was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).**   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date.   He found that she had severe impairments of left knee osteoarthritis and changes of the hip, degenerative disc disease of the cervical and lumbar spine, asthma/COPD, sleep apnea, hypothyroidism, obesity, right shoulder adhesive capsulitis, deep vein thrombosis, peripheral neuropathy and RSD, diabetes, learning disorder, mood disorder secondary to general medical condition, and history of substance abuse.   He determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Donaldson had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical and mental limitations.   She had no relevant past work.   Based on the testimony

of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

The record as it existed prior to the first ALJ's denial is summarized in the Report and Recommendation, Doc. 30, in Case No. 11-cv-554-JPG-CJP.

### 1.    Evidentiary Hearing

Ms. Donaldson was represented by an attorney at the evidentiary hearing before ALJ Janney on January 28, 2013.   (Tr. 920).

Plaintiff was 48 years old in January, 2013.   She finished the 8th grade and had not gotten a GED.   (Tr. 923).

Ms. Donaldson testified that her "main issue" was her hands.   She had been diagnosed with reflex sympathetic dystrophy.   She had problems with her hands for 10 years.   She testified that her hands "draw" and "crinkle up," and "don't do what you want them to do."   (Tr. 925-926).

Ms. Donaldson also testified that she had to use a wheelchair about 6 months out of the year because she was unable to put any pressure on her left leg.   She had been told she needed a knee replacement but she did not have any medical coverage.   (Tr. 928-929, 946).   She said that she sat with her legs elevated because "they hold a lot of swelling."   She elevated her legs "100 percent of the

6

time" while she was sitting.  (Tr. 942-943).  She testified that reaching overhead caused her pain in her left shoulder.  When her attorney pointed out that the medical records indicated that she had impingement syndrome of the right shoulder, she said that she was confused.  (Tr. 952-953).

A vocational expert (VE) also testified.   The ALJ stated that plaintiff had no past relevant work.  He asked the VE a series of hypothetical questions.  (Tr. 957-963).   One of the questions comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the sedentary exertional level with the following limitations:

- Only occasional climbing of ramps and stairs;

- No climbing of ladders, ropes or scaffolds.

- Only occasional balancing;

- No concentrated exposure to hazards in the workplace;

- No use of the lower extremities to operate foot controls

- Frequent reaching, handling and fingering, but only occasional overhead reaching with the right arm;

- No concentrated exposure to environmental irritants;

- "Due to a moderate degree of maintaining sustained concentration, persistence, or pace, could understand, remember, and carry out rote or routine types of instructions that would require the exercise of little independent judgment or decision making for two-hour work segments, but could not do so if the tasks were complex or detailed in nature."

(Tr. 957-959).

The VE testified that this person could do unskilled sedentary jobs such as assembler or production worker, hand packager, and inspector, weigher or tester.

(Tr. 958).   All work would be precluded if the person also needed to elevate her left leg, take 2 additional breaks a day, or was absent 3 to 4 times a month.   (Tr. 961-962).

### 3.   Medical Treatment

Dr. James Wachter of Carterville Family Practice was plaintiff's primary care physician.   In December, 2009, she saw him for pain in her left knee.   She was walking with a limp, and said her knee sometimes gave out on her.   Dr. Wachter noted that she was "trying to get disability."   He discussed with her "consideration of cane, walker, wheel chair or crutches as needed for management."   He suspected osteoarthritis of the left knee with possible internal derangement.   (Tr. 1465).   In April, 2010, he saw her to follow up on her diabetes, hypertension, hyperlipidemia and COPD.   There was no mention of knee pain.   She was noncompliant with her medications.   On exam, her extremities were symmetric with trace edema.   (Tr. 1464).   She returned in May, 2010, complaining of left knee pain without significant swelling, redness or warmth.   She said she was "using a wheelchair more" and had also been using a cane.   Dr. Wachter recommended physical therapy.   (Tr. 1461).

In May, 2010, a Doppler ultrasound study of plaintiff's left leg showed no evidence of deep vein thrombosis.   (Tr. 1405).

Ms. Donaldson returned to Dr. Wachter in October, 2010.   He noted that she had a long history of noncompliance with medications, and she had been discharged from physical therapy for noncompliance.   She had 2+ pitting edema of the lower extremities.   There was no mention of a wheelchair or cane.   (Tr.

8

1460).

Plaintiff was hospitalized for one night after she passed out at a friend's house in November, 2010.   She had diabetes and believed her blood sugar was low.   A drug screen was positive for cannabis as well as opiates.   (Tr. 1420-1421).

In March, 2011, Ms. Donaldson told Dr. Wachter that she had "episodes of near syncope."   He felt that her noncompliance with medications and skipping meals were causing many of her problems.   She also said she had bilateral hand weakness, which was "not identified on physical exam."   No swelling was noted in her legs, and there was no mention of a wheelchair or cane.   (Tr. 1785).   In April, 2011, she had a left wrist injury which was thought to be tendonitis.   Dr. Wachter prescribed Prednisone.   (Tr. 1781).   In May, 2011, she had again hurt her wrist while closing a window.   (Tr. 1780).   A month later, her pain was much improved, but not completely resolved.   She had a full range of motion of the shoulders, elbows, wrists and hands.   Grip strength was 4/5.   The assessment was tendonitis injury to left arm, forearm and wrist.   (Tr. 1779).

Ms. Donaldson had an episode of knee pain in August, 2011.   Dr. Nekzad, who practiced with Dr. Wachter, saw her.   She reported that she had gone to the emergency room, and an x-ray was unremarkable.   He ordered an MRI.   (Tr. 1771).

Ms. Donaldson was hospitalized due to "intractable" pain in her left knee in late August, 2011.   Dr. Wachter treated her.   An MRI was limited by patient motion.   The impression was diminished size of the lateral meniscus which might be related to her prior surgery, mild lateral compartment osteoarthrosis and

9

minimal chondromalacia patella, along with nonspecific findings of small joint effusion and edema. (Tr. 1721). She was in the hospital for 5 days. Dr. Wachter's final diagnoses were osteoarthritis of multiple joints, including the left knee, and chronic pain in the lower extremities secondary to peripheral neuropathy. (Tr. 1692-1693).

In September, 2011, Dr. Wachter noted that the "main finding continues to be only peripheral neuropathy of the leg." He also noted that there were "some inconsistencies" with her complaints of pain. On exam, she had diminished pulses and some mottling of both legs. There was slight edema in the left leg. She had minimal motion of the left knee, and said she had been sitting with her leg stretched out on the sofa all day. He also noted that her hair had been "recently washed and curled." He increased the dosage of Neurontin. (Tr. 1768).

She was hospitalized again at Herrin Hospital in early October, 2011, for cellulitis of the left elbow and MRSA. Dr. Wachter treated her at the hospital. The admitting note stated that Ms. Donaldson had gone to the emergency room a few days earlier, and had been prescribed antibiotics. However, she had not filled the prescription because of the cost. She was not taking her other medications either, due to lack of insurance and the cost of filling the prescriptions. She was in a wheelchair due to left leg pain. On exam, she had redness, warmth and swelling in the left elbow. She also had 1+ edema in the lower extremities. (Tr. 1841-1842). She was treated with antibiotics and discharged a few days later. In the discharge summary, Dr. Wachter noted that, with regard to her leg pain, she was ambulating up and down the hallway and was markedly better, but still had pain. He noted

that she had been "wheelchair bound not a month and a half ago associated with the leg pain."   (Tr. 1839-1840).

On October 21, 2011, she went to Herrin Hospital to have her port flushed.[4] She was noted to be "ambulatory," as opposed to using a wheelchair, walker, crutches or cane.   (Tr. 1826).   The same observation was made on December 2, 2011, February 13, 2012, and April 6, 2012.   (Tr. 1803, 1806, 1909).   The port was removed in April, 2012.   The pre-surgical note indicates that all four extremities were "grossly unremarkable."   There is no indication that she was in a wheelchair or using an assistive device.   (Tr. 1864-1866).

A physician's assistant in Dr. Wachter's office saw plaintiff on March 1, 2012. She said she hit her right elbow on a stove vent about a month earlier and had persistent shooting pain since then.   She could not hold a cup of coffee.   She had positive Tinel's sign and reduced range of motion.   She said she had problems paying for medical treatment.   Occupational therapy was recommended.   (Tr. 1756).   Plaintiff told the physical therapist that she had been cleaning a wall and hit her elbow on the hood of the stove.   The goals of therapy were to achieve range of motion within functional limits, minimal to no pain with use, and resume use of the extremity for all activities of daily living/work/leisure tasks.   (Tr. 1918-1919). She was discharged after attending 7 appointments.   The last visit was on April 25, 2012.   All therapy goals were met.   (Tr. 1915).

On May 3, 2012, plaintiff told Dr. Nekzad that she had been having headaches for the past 3 months.   She also said that therapy had not helped her

---

[4] A Port-A-Cath for chemotherapy infusion had been surgically inserted in July, 2008. (Tr. 566-567).

elbow.   He ordered MRI studies.   (Tr. 1755).   An MRI of the brain was unremarkable.   (Tr. 1875).   An MRI of the right elbow showed mild tendinopathy. (Tr. 1878).

In June, 2012, she complained to Dr. Wachter about decreased range of motion of the right shoulder.   He diagnosed right frozen shoulder, rotator cuff tendonitis and trapezius muscle soreness.   No complaints regarding her elbow or hands were recorded.   On exam, her extremities were symmetric with only trace edema.   There was no indication that she was in a wheelchair or using an assistive device.   Dr. Wachter noted that she had no insurance, so "going to therapy, etc., is not an option."   (Tr. 1752).   In July, 2012, Dr. Nekzad found that the range of motion of her right shoulder was extremely limited, and he strongly recommended physical therapy even though she had no insurance.   (Tr. 1751).

In October, 2012, Dr. Wachter noted no abnormal findings with regard to her extremities.   (Tr. 1748).

Ms. Donaldson went to the emergency room for headache and high blood pressure in November, 2012.   She denied neck pain, back pain, extremity pain, gait abnormality, and numbness.   An ECG was normal.   (Tr. 1953-1961).   A few days later, she was seen in the office by Dr. Wachter.   She said her blood pressure was going up and down, and she was sleeping poorly and had anxiety.   He prescribed Klonopin.   (Tr. 1937).   Ms. Donaldson called his office to get a refill on November 21, 2012.   She said that the medicine "was working."   (Tr. 1938).

The last medical record is dated December 18, 2012.   Ms. Donaldson complained of stiffness and soreness in the left lower back, and "swelling at times"

12

in her left knee.   On exam, she had "poor" range of motion in the back.   Dr. Wachter did not record any measurements of range of motion.   She had "some effusion" in the left knee, but no redness or warmth.   She was able to walk "without significant limp."   Dr. Wachter diagnosed osteoarthritis of the left knee, obesity, inactivity overall, and chronic low back pain with muscle spasm.   He advised her to continue with conservative management.   (Tr. 1936).

### 4.    Opinions of Drs. J. Michael Davis and Amar Sawar

Medical Source Statements from Drs. Davis and Sawar were in the record before the first ALJ.   Neither of those doctors apparently treated plaintiff after the Court remanded the case in July, 2012.

Dr. J. Michael Davis is an orthopedic surgeon.   He performed arthroscopic surgery on plaintiff's left knee for a lateral meniscal tear in September, 2006.   (Tr. 248-250).

On October 15, 2007, Dr. Davis filled out a form indicating that Ms. Donaldson could stand for only 5 to 10 minutes at a time, and could stand or walk for only a total of 1 hour out of a workday.   She required crutches to ambulate and could never do activities such as stooping or kneeling.   However, she was able to sit for 8 hours and had no restrictions in the use of her hands.   The form did not ask whether she needed to elevate her legs while seated.   (Tr. 386-392, 1274-1279).

Neurologist Dr. Amar Sawar assessed plaintiff's functional capacity in February, 2009.   He had been treating her since December, 2007.   He wrote that he treated her for reflex sympathetic dystrophy and tension headache.   He opined that she was capable of only sedentary work, and indicated that she would need a

13

job where she could change positions at will.   He said she did not need to use a cane or other assistive device when standing or walking.   In response to a question asking whether it was "medically reasonable" for plaintiff to elevate her feet while sitting, he answered "yes."   (Tr. 864-868, 1281-1285).

### 5.    Opinion of Physical Therapist

Mallori Wilson, PT, assessed plaintiff's functional capacity on July 5, 2011. She noted that Ms. Donaldson walked with a slight antalgic gait on the left.   There is no notation regarding swelling in the legs.   Ms. Wilson opined that Ms. Donaldson could only occasionally handle, finger and feel with both hands.   She also opined that Ms. Donaldson tested within the sedentary physical demand level, but she was not capable of competitive employment.   (Tr. 1630-1632).

### <u>Analysis</u>

The Court notes at the outset that plaintiff has not advanced a substantive challenge to the ALJ's finding that her statements regarding her symptoms and limitations were not credible.   To the extent that her arguments rely on her own statements, they are undermined by the adverse credibility finding.

Plaintiff first two points are intertwined.   She argues first that the ALJ did not properly account for her alleged need to elevate her legs and inability to frequently use her hands.   This argument incorporates her second point, that the ALJ did not properly consider the opinions of her doctors and physical therapist.

ALJ Janney set forth a detailed discussion of the medical evidence, analyzing it year-by-year.   See, Tr. 885-899.   The medical evidence was voluminous, and his analysis was detailed and thorough.   Plaintiff claims that she needed to elevate her

14

feet 100% of the time while she was seated in order to relieve swelling in her legs. Throughout his discussion of the evidence, the ALJ commented on evidence which indicated the presence or absence of swelling in plaintiff's legs.   He acknowledged that she had arthroscopic surgery on her left knee in 2006, and that she had some set-backs in 2007 while recovering from that surgery.   He also acknowledged that a treating doctor told her to elevate her legs due to swelling in 2007.   (Tr. 886-888). However, he concluded that the need to elevate her legs was temporary.

Plaintiff's argument is greatly weakened because it relies in large part on her own statements that she needed to elevate her legs.   The ALJ explained why he did not believe her, and plaintiff has not challenged his conclusion about her credibility. The rest of her argument relies on occasional notations in the medical records of swollen legs, Dr. Nanni's direction to elevate her leg, and Dr. Sawar's opinion. Contrary to plaintiff's suggestion, ALJ Janney did not ignore or disregard any of this evidence.   Rather, he explained in detail why he concluded that the record established only a temporary need to elevate her legs.

In her reply brief, plaintiff cites **Smith v. Astrue, 467 Fed. Appx. 507 (7th Cir. 2012)**, in support of her claim that the ALJ failed to properly consider her claim that she has to elevate her legs.   However, that case is of no help to plaintiff. The plaintiff in **Smith** advanced a successful attack on the ALJ's credibility determination.   Further, the ALJ in Smith failed to explain why he concluded that the plaintiff did not need to elevate his leg**s.    Smith, 467 Fed. Appx. at 510-511**. In contrast, Ms. Donaldson has not challenged the ALJ's credibility findings, and ALJ Janney exhaustively discussed the medical evidence and explained how, in his

15

view, it did not establish that Ms. Donaldson has to keep her legs elevated at all times while seated.

For the same reasons, the Court rejects Ms. Donaldson's claim that the ALJ did not properly consider whether she is able to use her hands frequently.   As the ALJ pointed out, the medical records simply do not support Ms. Donaldson's claim that her hands "crinkle" or "draw up" after she uses them for a short time.   The ALJ acknowledged the opinions of Dr. Sawar and PT Wilson, but adequately explained why he rejected them, as will be discussed more fully below.

With regard to her physical limitations, plaintiff does not point to any evidence that was overlooked or ignored by the ALJ.   On the contrary, the Court finds that ALJ exhaustively examined the voluminous medical evidence and specifically explained why he rejected both limitations.

ALJ Janney discussed the opinions of Drs. Davis and Sawar, as well as that of Ms. Wilson.   He acknowledged that Dr. Davis thought that she needed crutches to ambulate, could not ambulate without a wheelchair or assistive device, and could never use her left foot.   He also pointed out that Dr. Davis thought that plaintiff could use her hands continuously.   He acknowledged that Dr. Sawar opined that she did not need a cane or other assistive device, she needed to be able to elevate her feet, and she had limited ability to use her hands.   He gave these opinions little weight.   He also discussed Ms. Wilson's opinion, noting that, as a physical therapist, she is not acceptable medical source.   (Tr. 901-902).

Drs. Davis and Sawar are, of course, treating doctors.   The opinions of treating doctors are to be evaluated under 20 C.F.R. §404.1527.   Obviously, the

16

ALJ is not required to accept a treating doctor's opinion; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." ***Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).** If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527.   Supportability and consistency are two important factors to be considered in weighing medical opinions.   See, 20 C.F.R. §404.1527(d).   In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record."   ***Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).**

The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he may "bend over backwards" to help a patient obtain benefits.   ***Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).** See also, ***Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").**

When considered against this backdrop, the Court finds no error in the ALJ's weighing of the doctors' opinions.   ALJ Janney pointed out that the two doctors contradicted each other on whether Ms. Donaldson needed a wheelchair or assistive device to walk or stand, and on whether she was limited in using her hands.   He also pointed out that the treatment records contradicted Dr. Davis'

opinion that she needed a wheelchair or assistive device, and contradicted Dr. Sawar's opinion that she needed to elevate her legs and was limited in using her hands.   The ALJ also made the important point that these opinions were rendered in 2007 and 2009, respectively.   Substantial treatment occurred thereafter, and neither doctor had the benefit of reviewing the entire treatment record.

An ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of another physician, internally inconsistent, or inconsistent with other evidence in the record.   **Henke v. Astrue, 498 Fed.Appx. 636, 639 (7th Cir. 2012); Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007).**   Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax."   **Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008); Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008).**   The Court finds that ALJ Janney more than met the minimal articulation standard here.

With respect to Ms. Wilson's opinion, the ALJ correctly observed that, as a physical therapist, she is not an "acceptable medical source."   20 C.F.R. §404.1513(a); 416.913(a).   As such, her report does not constitute a "medical opinion."   See, 20 C.F.R. §404.1527(a)(2); 416.927(a)(2). ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources. . . .")   The ALJ was not required to analyze her report as a medical opinion under §404.1527, and her report was not entitled to any special weight or deference. Rather, the opinions of "other sources" such as Ms. Wilson may be considered, as

may any evidence in the record, to assess the severity of the claimant's impairments and the effect of her impairments on her ability to work.   §404.1513(d); 416.913(d).

Plaintiff argues that the ALJ erred in not considering PT Wilson's opinion under 20 C.F.R. §416.927(e), which concerns the evaluation of opinions from non-examining sources.   However, Ms. Wilson is not a non-examining source, and §416.927(e) has no application here.

The ALJ discounted Ms. Wilson's opinion because it was based on minimal testing and relied heavily on plaintiff's subjective statements.   The ALJ observed that it did not appear that Ms. Wilson conducted simulations of actual work activity as is generally seen in a "typical functional capacities evaluation such as a Blankenship evaluation."   He therefore determined that her opinion was "inherently unreliable."   (Tr. 902).   Plaintiff has not demonstrated any error committed by the ALJ in weighing Ms. Wilson's opinion.

Lastly, plaintiff challenges the mental limitations assessed by ALJ Janney. Because of her moderate limitation in ability to maintain concentration, persistence, or pace, the ALJ concluded that she "can understand, remember, and carry out rote or routine instructions that require the exercise of little independent judgment or decision making for two-hour work segments, but not if the tasks are complex or detailed."   (Tr. 882).   This limitation was included in the hypothetical question posed to the VE.   (Tr. 957-959).

It is difficult to discern exactly what plaintiff claims is wrong with the above limitation.   She points out that Dr. Sawar said that Ms. Donaldson's pain and

medication would affect her concentration for 50% of the day.   However, the ALJ adequately explained why he did not give much weight to Dr. Sawar's opinion.   In addition, plaintiff suggests that this limitation is simply a limitation to unskilled work.   However, this argument ignores the fact that the RFC assessment also limited her to two-hour work segments.

The Commissioner acknowledges that the RFC did not specifically limit plaintiff to simple one- or two-step tasks.   However, one of the jobs that the VE said she could perform is assembler or production worker.   According to the *Dictionary of Occupational Titles*, that job is limited to one- or two- step tasks.   It requires only "Reasoning: Level 1 - Apply commonsense understanding to carry out simple one- or two-step instructions."   See, Doc. 29, p. 10, n. 2; Doc. 29, Ex. 1.

It is far from clear that the ALJ erred in failing to specify one- or two-step tasks in the RFC assessment and the hypothetical question.   The ALJ excluded complex and detailed tasks, which seems to have the same effect.   In any event, the Commissioner argues, correctly, that any error was harmless.   Plaintiff acknowledges this in her reply brief, Doc. 31, p. 6, but argues that the ALJ's other errors make it "unclear whether or not Ms. Donaldson could sustain even this one job. . . ."   However, the ALJ did not commit any other errors, so it is clear that any error in failing to specify one- or two-steps tasks is harmless.   See, **McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011).**

In sum, none of plaintiff's arguments are meritorious.   Even if reasonable minds could differ as to whether Ms. Donaldson was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and

the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence.   ***Shideler v. Astrue***, **688 F.3d 306, 310 (7th Cir. 2012)**; ***Elder v. Astrue***, **529 F.3d 408, 413 (7th Cir. 2008).**   ALJ Janney's decision is supported by substantial evidence, and so must be affirmed.

<u>**Conclusion**</u>

After careful review of the record as a whole, the Court is convinced that ALJ Janney committed no errors of law, and that his findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Modest E. Donaldson's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

**DATE:   August 1, 2014.**

<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

21